Laurelyn SCHELLIN,
*Plaintiff,*

*v.*

DEPARTMENT OF REVENUE,
*Defendant.*

(TC 4419)

Trial was held December 14, 20, and 21, 1999, in the courtroom of the Oregon Tax Court, Salem.

Laurelyn Schellin, Plaintiff (taxpayer), argued the cause *pro se*.

Rochelle Nedeau, Assistant Attorney General, Department of Justice, Salem, argued the cause for Defendant (the department).

Decision for Defendant rendered April 7, 2000.

### CARL N. BYERS, Judge.

Plaintiff (taxpayer) appeals from a decision entered in the Magistrate Division. Due to a stipulation of the parties, only one of three issues addressed in the Magistrate Division remains: whether taxpayer's appeal from action taken on her application for proration of taxes is time barred.

### FACTS

Taxpayer's property is located in Salem. Mill Creek runs along the eastern edge of the property and as a consequence, the property has been susceptible to recurring floods. Improvements on the property include a garage and an older two-story home which suffers from much deferred maintenance.

During the 1995-96 tax year, taxpayer's property was twice flooded: once, in October 1995 when the storm drain in front of her home broke, and again in February 1996 (1995-96 floods). Because her home was damaged by those floods, taxpayer applied for "act of God" relief from property taxes under ORS 308.425.[1] Attached to that application (1995-96 application) were descriptions of fairly extensive damages. Taxpayer claimed that there had been four feet of water in the house and that a "concrete foundation slab," sheetrock, insulation, floors, floor coverings, cabinets, wall heating, baseboard heating, and a water heater all had to be replaced. She also indicated that doors, molding, a tub, toilet, sink, and outdoor fence all needed refitting, reinstalling, or repair.

Furnished with that information, and after visiting the property,[2] Basil Coxen, the county's appraiser who processed taxpayer's application, determined that the property's

---

[1] That statute provides for proration of taxes for property that is damaged or destroyed by an "act of God." All references to the Oregon Revised Statutes are to 1995.

[2] Although this fact was disputed, the court makes this finding based upon the preponderance of evidence.

post-flood real market value was $25,000: $20,000 for the land and $5,000 for improvements.[3] Jeff Procter, a Senior Appraiser for Marion County, testified that the $25,000 figure was a "low ball" figure reached due to the lack of time and resources available to the assessor.

Taxpayer did not appeal that valuation.[4] Consequently, that amount was used to determine the amount of property taxes to be prorated, resulting in taxpayer receiving a refund. That value would have also been used as the roll value for the 1996-97 tax year except that the county assessor applied neighborhood trending factors to taxpayer's property. The trending factors increased the land 14 percent and the improvements 10 percent resulting in a real market value of $28,300 for 1996-97.

Before taxpayer had made any substantial repairs necessitated by the 1995-96 floods, her property was again flooded in November and December 1996 (1996-97 flood). Taxpayer filed another application for proration of property taxes this time for the 1996-97 tax year (1996-97 application).

The assessor's office acknowledged receipt of taxpayer's 1996-97 application in a letter mailed March 7, 1997. That letter indicated:

"We will not begin work on these accounts until later this Spring. If you have not heard anything regarding your account by September, 1997, please feel free to contact us."

Taxpayer's next communication from the assessor was an "Assessor's Recommendation" form received around March 24, 1997. Relevant portions of that text are as follows:

---

[3] At trial it was shown that the Assessor's Recommendation initially contained different values as well as miscalculations regarding the final value. However, ultimately, the taxpayer received notice of the $25,000 post flood value.

[4] A letter from the Department of Revenue informed taxpayer that the assessor had determined her post-flood property value to be $25,000. That letter also indicated that if she disagreed with that value, she should notify the Department of Revenue to make a proper appeal. Taxpayer's application for proration of taxes contained similar instructions. No notification was ever made.

"LAND

JULY 1, <u>1996</u>      VALUE: <u>$22,800</u>      DAMAGED VALUE: <u>$22,800</u>

IMPROVEMENT

JULY 1, <u>1996</u>      VALUE: <u>$5,500</u>      DAMAGED VALUE: <u>$5,500</u>

TOTAL VALUE:            <u>$28,300</u>      DAMAGED VALUE: $28,300

VALUE RETURNED TO ROLL BY JULY 1, ____ (PRIOR TO TRENDING)

LAND:            ____

IMPROVEMENT:    ____      <u>NEW APPRAISAL BEING MADE</u>

TOTAL:          ____

REMARKS:        <u>New appraisal is being made.</u>"

Upon reading the above, taxpayer became confused as to whether the phrase "DAMAGED VALUE: $28,300" was notice of the assessor's post-damage property value determination or whether a new post-damage valuation was pending.

The source of her confusion was the remark "New appraisal is being made." Procter testified that that remark was included because no values were indicated in the section entitled "VALUE RETURNED TO ROLL." No values were placed there because taxpayer's property was in the process of being separately reappraised by the assessor's office as part of a statutorily mandated six-year cycle. The roll value for the subsequent 1997-98 tax year would be determined according to that separate appraisal and not by the post-damage valuation.[5] Therefore, any indication that would have been made on the Assessor's Recommendation had a high probability of subsequently changing.[6] Such change

---

[5] An initial value of $107,760 had already been estimated on February 5, 1997, based upon an outside inspection of the property by County Appraiser, John Poe. Procter testified that Poe's appraisal probably did not reflect flood damage to taxpayer's property.

[6] When taxpayer's act of God application was acted upon, Poe's appraisal was merely preliminary and subject to modification.

potentially could confuse taxpayer. Unfortunately, in an attempt to avoid that confusion, a new one was created.

Taxpayer testified that she took the Assessor's Recommendation to the assessor's office. What exactly transpired at the office was disputed by both parties. Taxpayer testified that she was told by a senior appraiser, Keith Brown, that she did not need to appeal her act of God application because a new appraisal was being made.

Brown testified that he did not specifically remember the conversation. However, he was fairly familiar with act of God application/appeal procedures. He testified that it has never been his practice to instruct taxpayers to not appeal their act of God applications.

Based upon her interpretation of that conversation, taxpayer did not file an appeal. She did not hear from the assessor's office again until she received a tax statement in November 1997. The tax statement showed a real market value of $108,460, which indicated to taxpayer that she had not received any tax relief for the 1996-97 flood. Taxpayer believed that due to the 1996-97 flood, the real market value should be reduced to less than $25,000.

Taxpayer again immediately went to the assessor's office to complain that she had not received any relief from her 1996-97 act of God application. There, she met Procter who, according to his testimony, told her that the assessor's office had acted on her application and had determined that she was not entitled to any tax relief. No further instructions regarding act of God relief procedures were given.

Taxpayer's description of that conversation was different. She testified that she was told specifically not to file an appeal because an act of God post-damage valuation was pending.

The next time that taxpayer effectively acted upon her 1996-97 application was May 8, 1998, when she filed an appeal in the Magistrate Division of this court.[7] The department claimed that taxpayer did not timely file an appeal of

---

[7] Taxpayer represented that she had made an appeal of the assessor's actions to the Board of Property Tax Appeals. However, that appeal attempt was ineffectual because the law clearly requires, and her act of God application directed, that such appeals must be made with the Department of Revenue. *See* ORS 305.275(1).

the assessor's pre- and post-damage valuations. Taxpayer now claims that the assessor misled her and therefore any statute of limitation defenses should be estopped.

## ISSUE

Is the department estopped from asserting that the statute of limitation prevents taxpayer from appealing the assessor's pre- and post-damage valuations?

## ANALYSIS

Two areas of law are relevant here: (1) act-of-God application procedures, and (2) equitable estoppel.

### A. *Act of God Application Procedures*

■ The legislature has provided for limited relief from property taxation when one's property is damaged by an act of God. ORS 308.425(1). To receive such tax relief, the taxpayer must submit an application to the tax collector who notifies the assessor. The assessor compares the real market value of the property before the damage to the real market value of the property after the damage. ORS 308.425(3)(b). The assessor then notifies the tax collector of the percentage of change. The tax collector uses that value percentage to refund a proportionate amount of property taxes based on the date of damage or destruction.

### B. *Estoppel*

■ "* * * [E]stoppel should not lightly be applied against the government." *Glancy v. Dept. of Rev.*, 12 OTR 117, 119 (1991). "The policy of efficient and effective tax collection makes the doctrine of rare application."*Johnson v. Tax Commission*, 248 Or 460, 463, 435 P2d 302 (1967). To succeed on a claim of estoppel against the state, a taxpayer must establish (1) misleading conduct by the state (2) good faith reliance on that conduct, and (3) injury to the party claiming estoppel. *Society of St. Vincent DePaul v. Dept. of Rev.*, 14 OTR 47, 50 (1996). A taxpayer claiming estoppel against the state must show "proof positive" that they were misled by the state. *Johnson*, 248 Or at 463. Mere testimony that the government orally misguided taxpayer, is generally, by itself, insufficient to show "proof positive" that the taxpayer was misled.

"There are many possibilities for misunderstanding with oral communication." *Mahler v. Dept. of Rev.*, 11 OTR 367, 370 (1990). Taxpayers are often unfamiliar with taxation procedures. It is easy for them to become confused even where correct information is given. *Rothenfluch v. Dept. of Rev.*, 11 OTR 322, 325 (1990). Additionally, the court often has no way to know the exact questions that taxpayers may ask when seeking direction from a government official. *Id.* Taxpayers may phrase their questions in a manner which leads a government official to believe they were inquiring about something other than what they intended. *Glancy*, 12 OTR at 120.

■ Written evidence of being misled is given greater weight than mere testimony. "If the tax authorities give the taxpayer the correct information in writing, that is the most reliable evidence of what was communicated." *Mahler*, 11 OTR at 370 (citing *Rothenfluch*, 11 OTR 322). "When written materials containing accurate information and advice are given to taxpayers, taxpayers may not continue to rely on an understanding based on oral representations or discussions which are contrary to the written information." *Smith v. Dept. of Rev.*, 13 OTR 206, 210 (1994).

■ Where, however, the written materials provide evidence of inaccurate or ambiguous representations, the court is more inclined to find "proof positive" that the taxpayer has been misled by tax authorities. *See, e.g., Pilgrim Turkey Packers v. Dept. of Rev.*, 261 Or 305, 493 P2d 1372 (1972) (where an ambiguous exemption form was found to be proof positive of misleading conduct).

Another element that taxpayer must show in order to succeed on an estoppel claim is "good faith reliance" on the state's misguidance. *Society of St. Vincent DePaul*, 14 OTR at 50. Describing that prong, the Supreme Court of Oregon has declared that "a party claiming estoppel must show reliance and 'a right to rely upon the representation of the estopped party.' (estoppel is a defense only if the required element of reliance is reasonable)." *Welch v. Washington County*, 314 Or 707, 716, 842 P2d 793 (1992) (citations omitted). There must be "a particularly valid reason for relying on the misinformation and [it must] be inequitable to a high degree to

compel the taxpayer to conform to the true requirement." *Johnson*, 248 Or at 463-64.

## APPLICATION

With the above understanding of the law, the court will now turn to the evidence of the case. Taxpayer timely filed her 1996-97 application by filing within the same tax year in which the damage to her property occurred. *See* ORS 308.425(2). After receiving taxpayer's application, the assessor, in accordance with ORS 308.425(3)(b), made a post-damage determination of taxpayer's property value ($28,300). Because that determination was equal to the property's pre-damage value ($28,300), taxpayer did not receive any tax relief for 1996-97 flood damage. Taxpayer disagreed with that determination and under ORS 305.275(1) was entitled to make an appeal.

ORS 305.280(1) requires that an appeal must be filed "within 90 days after the act or omission becomes actually known to the person, but in no event later than one year after the act or omission has occurred."

A.  *90-Day Limitation*

In order for the 90-day limitation to apply, taxpayer must have "actual knowledge" of the assessor's act or omission. ORS 305.280(1). The assessor, although not required to do so, attempted to apprise taxpayer of the value determinations. That was done by means of an "Assessor's Recommendation" and conversations between the assessor's office and taxpayer. None of those interactions seemed to provide taxpayer with "actual knowledge" that the assessor had made a final post-damage value determination.

The Assessor's Recommendation form and taxpayer's tax statement each had the potential to inform taxpayer of the assessor's action. However, each failed to actually do so. The Assessor's Recommendation failed in its attempt because it was ambiguous. The statement "NEW APPRAISAL BEING MADE" coupled with an indication that the "damaged value" was the same as the "July 1, 1996

value" led taxpayer to reasonably believe that a final post-damage determination may have still been pending. Taxpayer visited the assessor's office seeking clarification. However, she left with a belief that a final determination was still pending.

Later, taxpayer received her tax statement. However, that statement did not inform taxpayer of why she had not received any tax relief. Taxpayer again visited the assessor's office and left believing that the assessor's final post-damage determination was still pending and therefore, so was her relief.

Whether taxpayer's lack of actual knowledge was her own or the assessor's fault is not relevant. The 90-day limitation only applies if the taxpayer has "actual knowledge" of the assessor's act or omission. ORS 305.280(1). Here taxpayer's failure to appeal evidences her lack of "actual knowledge." Based upon taxpayer's history of immediately reacting to information with which she was dissatisfied, it is reasonable to conclude that had she actually known that a final determination had been made, she would have promptly appealed. The fact that she did not evidences a lack of "actual knowledge."[8] For that reason, the 90-day limitation will not be applied against the taxpayer.

B. *One-Year Limitation*

The second limitation provides that "in no event" is taxpayer entitled to appeal later than one year after the assessor's action. Here, the assessor's action occurred on March 24, 1997. Taxpayer failed to file an appeal with the Department of Revenue within one year of that date.

As a defense, taxpayer claimed that the assessor misled her to believe that the property's post-damage valuation was still pending. Taxpayer contends that the misguidance should estop enforcement of the one-year statute of limitation.

---

[8] Although taxpayer mistakenly believed that the assessor's office would file such appeals, no evidence indicated that taxpayer requested the assessor or anyone else to begin the appeal process for her. Therefore, the court concludes that no appeal attempt was ever made.

Taxpayer testified that she was orally misled by employees at the assessor's office on two separate occasions. The first occurred March 1997 when she sought clarification of the ambiguity contained in the Assessor's Recommendation. The second occurred in November when she spoke with Procter about her tax statement. The court finds such oral evidence insufficient to show "proof positive" that taxpayer had been misled.

Written materials however, are given greater weight than oral testimony. Here, the Assessor's Recommendation dated March 24, 1997, purportedly informed taxpayer of the assessor's final post-damage value determination.

The Assessor's Recommendation, as discussed above, was ambiguous. That form, like the one in *Pilgrim Turkey Packers*, although technically correct, was capable of producing more than one reasonable interpretation. One of those interpretations led taxpayer to believe that no final post-damage value determination had yet been made.

Taxpayer's 1997-98 tax statement inferentially indicated that she had not received any tax relief from the 1996-97 flood. However, she had no reason to believe that the absence of such relief was not due to a pending post-damage value determination.

For those reasons, the court finds (1) the taxpayer has shown "proof positive" that the assessor misled her to believe that a final determination of her property's post-damage value was still pending; and (2) it was reasonable for taxpayer to rely upon those representations.

The court will now turn to the issue of valuation. In determining what relief is due for act of God damage, the task is to determine the value of the property before and after the 1996-97 flood. ORS 308.425(3)(b). The assessor determined that taxpayer's pre- and post-flood property values were both $28,300. Taxpayer presented little evidence to rebut those determinations. The evidence that was provided failed to illustrate what property damage was caused by the 1996-97 flood as compared to the 1995-96 floods or deferred maintenance.

One of taxpayer's witnesses, Joseph Hutchinson, a construction manager for Ron Redding Construction, presented "ball park figures" of what it would cost to repair or replace many of the property's damages. Although he arrived at those figures in good faith, they were not helpful to the court. The estimate was based upon a visit he made to the property almost two years after the 1996-97 flood. No distinction was made between costs to repair damages caused by the 1996-97 flood and costs to repair damages present before that flood. That, coupled with evidence showing that taxpayer misrepresented construction company estimates, leads this court to give little weight to that testimony.

In contrast to taxpayer's evidence, Defendant's Exhibit H at 5 showed that following the 1995-96 floods, a county assessor visited taxpayer's property and determined that the property's post-flood value was $25,000. Taxpayer never appealed that valuation. For the subsequent tax year, taxpayer's property was trended upward 10 percent on improvements and 14 percent on the land. Those factors were determined by evaluating properties similar to and in the same general vicinity as taxpayer's property. No testimony indicated whether or not flooded properties were used to arrive at those trending factors. However, without much evidence to rebut the values reached by the assessor, the court finds, based upon the preponderance of the evidence, that the value of taxpayer's property before the 1996-97 flood was $28,300.

For determination of the property's post 1996-97 flood value, taxpayer again failed to provide the court with much valuable evidence. Acquaintances of taxpayer, Peter Herman and Pauline Goodwin both testified that the house was cold, damp and smelled of mildew. Neither of them indicated what damage or damage-increase was caused by the 1996-97 flood. According to their testimony, all of the damage they discussed existed or may have existed prior to the 1996-97 flood.

Taxpayer herself represented that the damage done to her property by the 1995-96 floods was very substantial. There had been four feet of water in the house. Floors, floor

coverings, a toilet, tub, sink, "concrete foundation slab," sheetrock, insulation, cabinets, and heating system all needed repairs or replacement. Taxpayer was unable to safely reside in her home. Despite those damages and risks to safety, taxpayer again returned to and began living in her home without making any significant repairs.

The sheetrock, insulation, wood and other items damaged by the 1995-96 floods lost much of their value during those first floods. Further subjecting those damaged items to water would not substantially affect their value. Left unrepaired, the value of flood damaged sheet rock or rotten wood generally will not significantly further diminish when flooded again. Most if not all of the diminution in value occurred during the first flood. For that reason, the court believes that the 1995-96 floods left the property in such a poor condition that the 1996-97 flood did not substantially decrease the value further. Assuming that some further nominal damage did occur, the court is unable to determine the extent of that damage. All of the damage discussed in evidence already existed or may have existed before the 1996-97 flood.

The following evidence supports the department's position that taxpayer's property value after the flood was at least $28,300. In an appeal for the 1997-98 tax year, which began five months after the 1996-97 flood, taxpayer claimed that the real market value of her property was actually $28,300. Taxpayer represented that almost no repairs were done to her property during the interim between the 1996-97 flood and her appeal to the Board of Property Tax Appeals.

Additionally, an appraisal of taxpayer's property was conducted shortly after the 1996-97 flood. That appraisal valued taxpayer's property at $107,760. The fact that the appraiser who made that determination was not aware of any flooding problems weakens the probativeness of that appraisal. However, it may at the very least provide an indication that it was probably not worth less than $28,300.

Therefore, based upon the preponderance of the evidence, the court finds that taxpayer has not sustained her burden of proof to show that the value of her house after the 1996-97 flood was lower than $28,300. Therefore she is not

entitled to tax relief provided by ORS 308.425. Costs to neither party.